# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **SANBONITA WEST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 10 C 5761** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **CAROLYN COLVIN, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

The Plaintiff, Sanbonita West, seeks review of the final decision of the Commissioner

("Commissioner") of the Social Security Administration ("Agency"), denying her application for

Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act ("Act"), 42

U.S.C. § 1383(c)(3).  Ms. West asks the court to reverse the Commissioner's decision for an

award of benefits, or, in the alternative, to reverse and remand the Commissioner's decision.

The Commissioner seeks an order affirming the decision.

## I.
### Procedural History of the Case

Ms. West filed an application for SSI[1] on August 25, 2005, alleging that she had been

disabled since December 3, 2004.  (Administrative Record ("R.") 21, 168–69).  The claim was

denied initially and upon reconsideration.  (R. 104–07, 110–12).  Ms. West filed a request for a

hearing with an Administrative Law Judge ("ALJ") on August 18, 2006.  (R. 114–15).

---

[1] The Commissioner's Response brief provides that Ms. West applied for both SSI and Disability Insurance Benefits ("DIB").  (Def.'s Resp. Pl.'s Mot. Summ. J. 1).  However, the record includes no DIB application, nor is one referenced in the ALJ's decision or the Plaintiff's brief.

An ALJ convened a hearing on June 15, 2009, at which Ms. West, represented by counsel, appeared and testified. (*See* R. 48–101). Also appearing and testifying were Sheldon J. Slodki, M.D., an impartial medical expert, and Glee Ann L. Kehr, an impartial vocational expert. (*See* R. 48–101). On July 28, 2009, the ALJ issued a decision denying the application for SSI because, "considering Ms. West's age, education, work experience, and residual functional capacity ("RFC"), the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 29). This became the final decision of the Commissioner when the Appeals Council denied Ms. West's request for review of the decision on July 9, 2010. (R. 1–3). Ms. West has appealed the decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## The Evidence of Record

### A.
### The Vocational Evidence

Ms. West was born on August 3, 1984, (R. 168), making her twenty-four years old at the time of the ALJ's decision. (*See* R. 18). Ms. West completed tenth grade and has a GED. (R. 55–56). She last worked as an aide for her grandmother from May 2008 until April 2009, and was paid by Addus Healthcare. (R. 52–53, 247). Ms. West's working history also includes answering phones for the Regional Transportation Authority ("RTA") from May until December 2004, (R. 59, 247), completing a six-month Job Corps training program beginning in March 2007, (R. 56, 60), and keeping inventory and preparing customers at a hair salon from March 2006 until April 2008. (R. 59).

**B.**
**The Medical Evidence**

In 2005, Ms. West began experiencing backaches and pain in her right leg, (R. 249, 255, 265), and an MRI from April 23, 2005 revealed broad-based, right paramedian disc protrusion and mild bilateral facet degenerative disease at level L5-S1.  (R. 311).  She received lumbar epidural steroid injections at L5-S1 on July 25, August 8, August 22, and November 29, 2005, and January 4, 2006 at the Advocate Christ Medical Center in Oak Lawn, Illinois.  (R. 262–64, 303, 308–09).  Ms. West also received a right selective nerve root block at L5-S1 on October 31, 2005.  (R. 306).

On October 3, 2005, Ms. West completed an "Activities of Daily Living Questionnaire." (*See* R. 196–203).  She reported that she lived with her grandmother, cooked her own meals, cleaned once every other week, rarely did laundry or ironed, and performed yard work every month and a half, if ever.  (R. 196).  Ms. West reported that she could not take showers because of pain in her right leg when entering the tub, and that she took Prevacid and Zoloft.  (R. 197). According to Ms. West, she did not sleep well because of pain in her right leg.  (R. 198).  Ms. West reported that she got along with other people, was not afraid of others, did not get angry with other individuals, but did get upset when criticized.  (R. 198–99).  She noted that she did not enjoy her hobbies as much because of her pain, and that she did not feel motivated to go to church.  (R. 199).  According to Ms. West, she could not sit for two hours at a time, could not go shopping or prepare a meal without needing to sit, and was no longer able to walk long distances, exercise, dance, or stand for long periods of time.  (R. 202–03).

On December 22, 2005, Ms. West underwent an internal medicine evaluation by Fauzia A. Rana, M.D.  (R. 277–81).  Dr. Rana reported that Ms. West was 66.5 inches tall and weighed

306 pounds. (R. 277). Ms. West's pulse was seventy-eight beats per minute, and was regular in rate and rhythm. (R. 278). Dr. Rana noted that Ms. West had suffered from chronic back pain since 2001, had difficulty in prolonged sitting and standing, and sometimes had difficulty bending down and getting up. (R. 277). Ms. West reported that her back pain sometimes radiated to her right leg. (R. 277). Dr. Rana assessed that Ms. West could walk on her heels and toes, squat, and had a normal gait while walking. (R. 279). Ms. West complained of chest pains, and reported that such pains usually arose when she was under stress. (R. 277). Ms. West denied hallucinations and suicidal thoughts, but acknowledged that she had attempted suicide in the past. (R. 277). Dr. Rana concluded that Ms. West had chronic back pain, atypical chest pain, anxiety and depression, and suffered from gross obesity. (R. 279).

Ms. West also underwent a psychiatric evaluation on December 22, 2005 with Ana A. Gil, M.D. (R. 273–76). Ms. West reported that she had been seeing her psychologist, Vicky Todd, on a weekly basis at the Roseland Mental Health Center, and that Ms. Todd's internist, Dr. Pierro, had been treating her with Zoloft. (R. 273). Ms. West stated that she was living with and taking care of her grandmother who had Alzheimer's disease. (R. 273). She reported that she did her own cooking, cleaning, laundry, and grocery shopping, was able to pay her own bills, and had some friends. (R. 274).

Ms. West reported that she experienced crying spells once a week, and that she had become increasingly anxious, particularly around large crowds. (R. 273). She acknowledged that she felt better once she evaded the crowd, (R. 273), and stated that she tried to avoid public transportation when it was crowded. (R. 274). She denied feeling hopeless or helpless, and denied difficulty in concentrating. (R. 273).

Dr. Gil noted that Ms. West's affect appeared to be sad, and that her mood appeared dysphoric. (R. 275). When tested, Ms. West was able to repeat seven numbers forward and backward, recall recent news, state her birth date and address, and perform basic calculations. (R. 275). Dr. Gil concluded that Ms. West's symptoms indicated an adjustment disorder with mixed features of anxiety and depression. (R. 276). In addition, Dr. Gil opined that there was no evidence of psychosis or a thought process disorder. (R. 276).

On January 25, 2006, Heinrich Jerrold, Ph.D., a state agency psychologist, performed a psychiatric review of Ms. West. (R. 282–95). Dr. Jerrold determined that Ms. West did not have a severe mental impairment. (R. 282). He did assess that Ms. West had affective disorders and anxiety-related disorders, (R. 282), and concluded that Ms. West suffered from an adjustment disorder with mixed features of anxiety and depression. (R. 285).

On May 1, 2006, Ms. West had a laminotomy with diskectomy surgery for her back at the Advocate Christ Medical Center, and was discharged on May 3. (R. 316, 326–27). Shortly after surgery, on May 19, 2006, Delano Zimmerman, M.D., reviewed the medical evidence and made a physical RFC assessment, concluding that Ms. West was limited to light work. (R. 335–42). Dr. Zimmerman assessed that Ms. West could occasionally lift or carry twenty pounds, frequently lift ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and had no limitations in her ability to push or pull. (R. 336). Dr. Zimmerman noted that Ms. West had a long history of back problems, but concluded that the condition would likely resolve within twelve months. (R. 342).

In August 2006, Ms. Todd completed a mental impairment questionnaire for Ms. West that had been provided by her attorney. (R. 344). Ms. Todd reported that Ms. West's Global Assessment of Functioning ("GAF") was 60, and that her highest GAF in the past year had been

5

55.[2]  (R. 344).  Ms. Todd noted that Ms. West exhibited mood swings and complained of severe pain in her lower back.  (R. 345–46).  In addition, Ms. Todd reported that she anticipated Ms. West missing work more than three times a month due to her impairments or treatment.  (R. 347).

Ms. Todd opined that Ms. West had a "fair" ability to maintain regular attendance, complete a normal workday without interruptions from symptoms, perform at a consistent pace without an unreasonable amount of rest periods, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions.  (R. 348–49).  Ms. Todd also assessed that Ms. West had "poor" or no ability to sustain an ordinary routine, work in coordination with or in proximity to others, or accept instructions and respond appropriately to criticism.  (R. 348).  Similarly, Ms. Todd determined that Ms. West had a "fair" ability to understand and remember detailed instructions, set realistic goals, and deal with stress of semiskilled and skilled work, but that Ms. West had a "poor" ability to carry out detailed instructions.  (R. 349).  In addition, Ms. Todd opined that Ms. West had a "fair" ability to maintain socially appropriate behavior and use public transportation, but a "poor" ability to interact appropriately with the general public.  (R. 350).  Ms. Todd also gave Ms. West a rating of "good" for numerous mental abilities and aptitudes including remembering work-like procedures and instructions, maintaining attention, and making work related decisions.  (R. 348–50).  According to Ms. Todd, Ms. West had moderate restrictions of activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and

---

[2] These scores indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.

repeated (three or more) episodes of deterioration or decompensation in work or work-like settings. (R. 350).

On October 19, 2006, Ms. West underwent a psychiatric evaluation by Dr. Tate at Roseland Mental Health Center. (R. 557–58). Dr. Tate diagnosed Ms. West with a major depressive disorder, a panic disorder, and assigned her a GAF score of 50.[3] (R. 558).

After a period of time without seeing Ms. Todd on a weekly basis,[4] Ms. West returned to Roseland Mental Health Center in September 2008 to resume her weekly counseling sessions with Ms. Todd. (R. 373–78). Ms. West cited stress from a relationship as her reason for returning to the center, (R. 365), and reported that she had friends stay with her to keep her company. (R. 436, 477). She also reported that she engaged in social activities and attended church. (R. 449, 466, 477). Ms. West was still seeing Ms. Todd in 2009. (R. 51, 411–30). Between 2008 and 2009, Ms. Todd continually noted that Ms. West suffered from heartburn, obesity, low back pain, and a major depressive disorder. (R. 411–60). In addition, between 2008 and 2009, Ms. Todd frequently reported that Ms. West was "stable." (R. 417, 428, 430, 439, 443, 445, 451). Ms. West's GAF score was consistently 60, indicating no more than moderate symptoms. (R. 438–77).

---

[3] This score indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

[4] The Record supports Ms. West's assertion that Ms. West saw Ms. Todd frequently between 2005 and March 2008. (R. 478–546).

**1.**
**Ms. West's Testimony**

At the hearing before the ALJ, Ms. West testified that she was single and lived with her grandmother.  (R. 57).  Her grandmother was in the hospital, but Ms. West still lived in her grandmother's apartment.  (R. 57–58).  Ms. West was twenty-four years old at the time of the hearing, had a GED, and could add, subtract, multiply, and read.  (R. 55–58).  Ms. West did not have a driver's license but did have a "Link card."  (R. 57, 65).  She was not looking for work because she wanted to see what would happen with her grandmother, and was concerned about the stress level at potential jobs.  (R. 58).  She testified that a former job—answering phones at the RTA—was stressful.  (R. 58, 60).

Ms. West testified that she received a certificate of completion from Job Corps for "information technology/wed design" in 2007, and received training from Addus Healthcare in 2008.  (R. 56–57).  Her Job Corps training allowed her to use Windows and Excel programs.  (R. 56).  The Job Corps training took place in the Chicago area and lasted six months.  (R. 60).  The training took place five days a week from 8:00 a.m. until 4:00 or 4:30 p.m.  (R. 60).  During this time period, Ms. West lived on campus and shared a dorm room with three other people.  (R. 60–61).  She testified that she "got along fine" with the other three individuals.  (R. 61).  Ms. West ate at the cafeteria, did her own laundry, showed up on time every day, and had no disciplinary problems.  (R. 61).  Ms. West testified that she "liked it fine" and that "[i]t was okay."  (R. 61).

Ms. West then testified that during that time she met with Vicky Todd at Roseland Mental Health Center.  (R. 62).  Ms. West saw Ms. Todd once a week, and was prescribed

Zoloft. (R. 62). Ms. West was no longer taking any medication because she wanted to use natural medicine, although she was not taking natural medicines at the time of the hearing. (R. 62–63). When asked how she currently felt, Ms. West testified that she felt better than she did before, that she didn't need medication, and that she didn't feel as though the medication had been working for her. (R. 63).

Ms. West testified that she decided to apply for social security in 2005 because she had back pains and "was not able to work at all." (R. 63). She asserted that after the diskectomy, she was healed about two or two and half months later. (R. 64). After Ms. West healed from the surgery in 2006, she took care of her grandmother, but testified that she was not getting paid for it. (R. 64). During this time, Ms. West fed her grandmother, sometimes took care of her grandmother's personal hygiene, and put her in bed. (R. 64). Ms. West did her own laundry and bought her own groceries. (R. 65).

Ms. West cooked, cleaned, vacuumed, mopped, and dusted. (R. 65). She was able to take care of her personal hygiene, liked to write and draw, and had friends. (R. 66). Ms. West testified that she got along with her family, "[f]or the most part." (R. 66). When asked if she could perform a job which entailed "putting bottles in boxes," provided that it was a low-stress job, Ms. West responded that she "possibly" could perform such a job. (R. 67).

When asked about her pain, Ms. West testified that at the time of the hearing, her chest pains were probably the most painful, although they had not been diagnosed. (R. 67). Ms. West was not receiving treatment for the chest pains. (R. 68). She then testified that she had upper and lower back pain, and that her upper back hurt "maybe five days a week." (R. 68). Ms. West stated that when her upper back hurt, it hurt "maybe six [or] seven hours out of the day." (R. 69). When her upper back hurt, Ms. West would not take pain medications, and would instead

do something to take her mind off of the pain. (R. 69). Ms. West testified that her pain constituted "about a [five] at the most" on a scale from one to ten, with ten representing extreme pain. (R. 69). Ms. West then testified that her lower back hurt two or three times a week for about six or seven hours on those days, and that when it hurt, it "sometimes" was a ten. (R. 69–70). Ms. West stated that when her lower back hurt, she did not take medication, and that she instead used a heating pad which worked well enough for her to function. (R. 70).

When asked if she had been hospitalized within the last year or if she had a treating doctor, Ms. West responded to both of those questions in the negative. (R. 70). Ms. West was not seeing a psychiatrist. (R. 70).

Ms. West then testified that although her back condition had improved since the surgery, it had started to get worse again. (R. 71). When asked how far she could comfortably walk, she responded that she could walk "[m]aybe three and half blocks" before she felt pain in her lower back. (R. 71). Ms. West testified that when she felt such pain, she tried to cope with it, or took the bus if she needed to walk a longer distance. (R. 71). When asked how long she could comfortably stand, she responded that she could stand for thirty minutes before feeling pain in her back and legs. (R. 71–72). When asked if she could sit for an eight-hour day, provided that she could shift in her seat and stand, Ms. West responded that she possibly could, and that if she could not, it would be because of the pain. (R. 72–73). Ms. West then testified that she could reach overhead, pick up coins on a table, lift a gallon jug of milk, and lift two gallons, one in each hand. (R. 73).

Ms. West then testified about her employment with Addus Healthcare. (R. 73). Ms. West would get her grandmother out of bed in the morning, wash her up, and "put her in the front room in her chair." (R. 74). Ms. West took care of her grandmother, while being paid by

Addus Healthcare, for seven hours a day. (R. 74). Ms. West stated that she "would not want to do personal care for another person." (R. 74). When asked if there was something that would physically prevent her from caring for another individual, Ms. West testified that "it's like a whole mental thing" and that she did "not want to get up close and personal with other people like that." (R. 75).

Ms. West testified that she was able to get around without significant pain a month or two after surgery. (R. 75). When asked if the Job Corps training was a rigorous program, she responded that it was. (R. 75). Ms. West testified that she still deals with social anxiety, and that she tries to avoid big crowds. (R. 76). When asked how much time she spent outside of the house while caring for her grandmother, she testified that she would go to church on Sundays for about four hours, and sometimes would go out for an hour or two on Saturdays. (R. 76). Ms. West then testified that she interacted with people less at the time of the hearing than she did a year or two before. (R. 76–77). She reasoned that someone had to be there when the hospital called. (R. 77).

When asked if she felt as though she could have performed a job requiring that she sit for six out of eight hours a day at a point during the relevant time period, Ms. West responded that she might have been able to do so "during the Job Corps period" in 2007. (R. 78–79). Ms. West then testified that large crowds made her nervous, but acknowledged that her nervousness never prevented her from going to her Chicago Department of Health appointments. (R. 80).

Ms. West then testified that during the Job Corps training program in 2007, she spent most of the time in class. (R. 80–81). In her free time, Ms. West studied in her dorm room or hung out with people she met at Job Corps. (R. 81). When asked if she was "okay" in smaller groups, Ms. West responded that she was, and reiterated that she does not like big crowds. (R.

81).  She testified that she would wait for the next bus if a bus was packed, and would not want to be in Grant Park for the Fourth of July fireworks.  (R. 81).  Ms. West then testified that she could walk down a Chicago street, as long as there were "not a whole lot of people."  (R. 81).

## 2.
## The Medical Expert's Testimony

Sheldon J. Slodki, M.D., then testified as an impartial medical expert ("ME").  (R. 82–92).  The ME testified that between August 2005 and August 2006, Ms. West had a pain problem but didn't have ineffective ambulation, and therefore did not meet the listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 84).  When asked about Ms. West's RFC during that twelve-month period, the ME responded that he did not disagree with a finding that Ms. West could perform light work.  (R. 84).  Further, the ME testified that nothing in the record indicated that Ms. West could not do sedentary during that twelve-month period.  (R. 85).  When asked about Ms. West's RFC before the surgery, the ME testified that it was sedentary because of Ms. West's pain.  (R. 86–87).  The ME assessed that after Ms. West had recovered from surgery (starting around August 2006), her RFC would enable her to perform light work.  (R. 87).  The ME added that his assessment took Ms. West's obesity into consideration.  (R. 87).

The ME then opined that Ms. West would have been able to work a job prior to the surgery, despite her pain.  (R. 88).  He testified that pain, without motor loss, usually does not reduce function, but acknowledged that it is possible that such pain could affect an individual's ability to function mentally.  (R. 89).  When asked if an inference could be made regarding Ms. West's pain considering the procedures she was willing to subject herself to, the ME testified that "sensitivity to pain and pain threshold var[y] greatly from person to person."  (R. 90).  The

ME testified that if ethical doctors felt that the complaint of pain was false, they would not have performed epidural steroid injections.  (R. 91).

### 3.
### The Vocational Expert's Testimony

Glee Ann L. Kehr then testified as an impartial vocational expert ("VE").  (R. 94–99). The VE testified that the only job performed by Ms. West constituting substantial gainful activity during the relevant time period would be classified as a home healthcare aid, and that this job would be "medium" in physical demand, and low and semi-skilled in nature.  (R. 94–95).  The ALJ then asked the VE to assume a claimant with Ms. West's age, education, work experience, and RFC for the period of August 2005 to August 2006.  (*See* R. 28, 95).  The VE opined that the hypothetical person could not perform Ms. West's past relevant work, but assessed that this person could perform sedentary jobs such as that of an account clerk (1,600 jobs in the area[5]), telephone clerk (2,300 positions in the area), or order clerk (4,000 positions in the area).  (R. 96).  The ALJ then asked the VE to assume a claimant with Ms. West's age, education, work experience, and RFC for the period following August 2006.  (*See* R. 97).  The VE opined that the hypothetical person could not perform Ms. West's past relevant work, but could perform the following positions: counter clerk (1,800 positions in the area), office helper (2,100 positions in the area), or information clerk (2,300 positions in the area).  (R. 97–98).

The ALJ then asked the VE to define the "sit-stand" option.  (R. 98).  The VE stated that an individual with this option may be standing as much as two-thirds of the workday, but remains productive and on task as much as eighty-five percent of the time.  (R. 98).  If "poor to

---

[5] The VE reduced each of these numbers, for both time periods, to allow for the sit-stand option.  (R. 96).  The statistics are drawn from the Bureau of Labor Statistics of the Department of Labor.  (R. 96).

no ability to sustain an ordinary routine without special supervision" were added to the first hypothetical, the VE acknowledged that her answer would change, and that the hypothetical person would need to "stay on task," and could not miss more than roughly one day per month. (R. 98–99).

**D.**
**The ALJ's Decision**

After finding that Ms. West had engaged in substantial gainful activity since August 25, 2005,[6] her alleged onset date, the ALJ found Ms. West to have the following severe impairments: chronic low back pain, obesity, and depression. (R. 23). In her analysis, the ALJ assessed that the mental RFC assigned to Ms. West by Ms. Todd was inconsistent with the GAF score assigned by Ms. Todd, Ms. West's activities, and Dr. Jerrold's conclusion that Ms. West's mental impairment was not severe. (R. 24). However, the ALJ gave Ms. West "every benefit of the doubt," and determined that her mental impairment was severe. (R. 24). The ALJ noted that Ms. West completed Job Corps training (and lived cooperatively in a dormitory with three people), worked at the substantial gainful activity level for her grandmother for eleven months, testified that she got along with friends but did not like crowds, and had her GED. (R. 24). The ALJ also noted that Ms. Todd repeatedly described Ms. West as "stable," and that Ms. West had been consistently assigned a GAF score of 60. (R. 23–24). The ALJ concluded that Ms. West had "mild limitations in activities of daily living," "moderate limitations in social functioning," and "mild limitations in concentration, persistence, and pace." (R. 24). The ALJ added that Ms.

---

[6] The ALJ's Decision provides that the "claimant engaged in substantial gainful activity since August 25, 2005," referring to the work Ms. West performed for her grandmother. (R. 23). However, the ALJ did not end her inquiry at this point. (*See* R. 23–29). Rather, the ALJ's conclusion that Ms. West was not disabled is based on her ability to perform other work. (*See* R. 29).

Todd's treatment notes did not indicate problems with concentration, persistence, or pace, and that there was no evidence of decompensation. (R. 24).

The ALJ then found that Ms. West did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Commissioner's regulations. (R. 24). As to Ms. West's back impairment, the ALJ reasoned that the impairment did not have the diagnoses described under the listing (no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis). (R. 24). Further, the ALJ reasoned that Ms. West had no other impairment that met the requirements of a listing on its own and also had no impairment that, in combination with her obesity, met the requirements of a listing. (R. 24). Finally, the ALJ determined that Ms. Todd's assessment of Ms. West's mental impairment was inconsistent with Ms. Todd's GAF score and Ms. Todd's own evaluations of Ms. West's mental abilities and aptitude to do unskilled work. (R. 26).

The ALJ further reasoned, as to Ms. West's back impairment, that Ms. West worked for eleven months at the substantial gainful activity level for her grandmother, had successful surgery in May 2006, and although Ms. West described her back pain as sometimes reaching a "ten," she was not using prescription pain medications, and instead only used a heat pad and over-the-counter medications. (R. 25). The ALJ considered that Ms. West underwent six lumbar epidural steroid injections for her back. (R. 25). The ALJ also noted Dr. Rana's examination of Ms. West, and assessed that it was "simply not credible that claimant's pain [was] as intractable as she describe[d]." (R. 25). The ALJ noted the ME's opinion that there was not a period of twelve months or more during which Ms. West could not have done sedentary work, and concluded that Ms. West had required little further treatment following her

surgery, was prescribed no medications, and that her obesity exacerbated her physical condition. (R. 26).

The ALJ determined that Ms. West had the RFC to perform sedentary work prior to her surgery (August 2005 to August 2006), and that in the period following Ms. West's recovery from surgery (beginning in August 2006), Ms. West had the RFC to perform light work. (R. 26). The ALJ reached this conclusion by considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as opinion evidence. (R. 27). The ALJ found that while Ms. West's impairments "could reasonably be expected to cause the alleged symptoms," Ms. West's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [ALJ's] [RFC] assessment." (R. 27). The ALJ concluded that Ms. West's statements regarding her pain were not credible after noting that Ms. West used over-the-counter medications and a heat pad instead of prescription medications. (R. 27).

The ALJ considered Dr. Zimmerman's RFC assessment dated May 19, 2006, and found that although Dr. Zimmerman opined that Ms. West would have been able to perform light work in the twelve-month period prior to surgery, Ms. West could have performed "no more than sedentary work" during that period. (R. 27). The ALJ agreed with the ME that "there was never a period of [twelve] months or more that [Ms. West] could not have performed sedentary work." (R. 27). In making this determination, the ALJ reasoned that Ms. West was able to perform sedentary work prior to surgery and light work after her surgery. (R. 27). The ALJ added that Ms. West had been performing medium work for her grandmother. (R. 27).

The ALJ found Ms. West unable to perform her past relevant work based on the fact that her past relevant work involved "at least medium exertional demands." (R. 28). However, based on the VE's response to the hypothetical person with Ms. West's limitations, the ALJ determined that a significant number of jobs existed in the national economy that Ms. West could perform, both prior to her surgery and following her recovery. (R. 28–29).

The ALJ ultimately concluded that Ms. West had not been under a disability defined from August 25, 2005, through the date of the ALJ's decision. (R. 29).

### III.
### Analysis

### A.
### Standard of Review

We review the ALJ's decision directly, but we play an "'extremely limited'" role. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). "We do not actually review whether [the claimant] is disabled, but whether the . . . finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The court may not reweigh evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citing *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000)). However, despite this deferential standard, the court cannot "'rubber stamp'" the

Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (quoting *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992)). The ALJ's decision must allow the court to assess the validity of the findings and afford the plaintiff a meaningful judicial review. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citations omitted). This standard is satisfied if the ALJ articulates, "at some minimum level, her analysis of the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

Although the ALJ must have constructed a logical bridge, the court will "'give the opinion a commonsensical reading rather than nitpicking at it.'" *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (quoting *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999)). Further, "[n]o principle of administrative law or common sense requires us to remand a cause in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted).

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or medically equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work;

5)   is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520(4); *Simila*, 573 F.3d at 512–13 (citing *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)).  An affirmative answer leads either to the next step or, at steps three and five, to a finding that the claimant is disabled.  20 C.F.R. § 416.920(4)(i)–(v); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005).  A negative answer at any point, other than step three, stops the inquiry and leads to a determination that the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i)–(v); *see Briscoe*, 425 F.3d at 352.  The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five.  *Briscoe*, 425 F.3d at 352 (citing *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004)).

## C.
## Ms. West's Arguments

Ms. West raises two primary arguments for reversal and remand: (1) the ALJ did not properly consider Ms. West's mental impairments in her RFC assessment; and (2) the ALJ did not properly evaluate Ms. West's credibility with regard to pain.  (Mem. Supp. Pl.'s Mot. Reverse 5, 11; Pl.'s Reply Supp. Pl.'s Mot. Reverse 1, 4).

## 1.
## Sufficiency of the Mental RFC Assessment

In her RFC assessment, the ALJ determined that Ms. West "could perform simple tasks, could have been collegial with employees, had no problems with cooperation, but needed limited exposure to crowds."  (R. 26).  Ms. West argues that the ALJ did not explain the basis for this conclusion, and that there was no medical basis for such a finding in the record.  (Mem. Supp. Pl.'s Mot. Reverse 5).  Ms. West concludes that without a medical basis for the mental RFC assessment, the ALJ failed to construct a "logical bridge."  (*Id.* at 6).  Ms. West's contentions are unpersuasive.

19

The Commissioner's regulations provide that the ALJ is responsible for making the RFC assessment. 20 C.F.R. § 404.1546(c). The RFC assessment is "an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon*, 270 F.3d at 1178 (citing 20 C.F.R. § 404.1545(a)). Mental limitations are an essential component of the RFC assessment "because '[a] limited ability to carry out certain mental activities . . . may reduce [a claimant's] ability to do past work and other work.'" *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1545(c)). In making her RFC assessment, the ALJ "must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (citing 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a)). The ALJ "need not accept only physicians' opinions," and "if conflicting medical evidence is present, the [ALJ] has the responsibility of resolving the conflict." *Id.* When a reviewing court considers the ALJ's RFC assessment, it should not substitute its own analysis or reweigh the evidence. *See Terry*, 580 F.3d at 475. Rather, if the ALJ's assessment is supported by substantial evidence, it should be affirmed. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

It is true that the ALJ only discussed Ms. West's physical impairments in the section of the decision devoted to the RFC assessment. (*See* R. 26–28). However, the ALJ discussed Ms. West's mental RFC in the section of the decision devoted to determining whether Ms. West's impairments were severe. (*See* R. 24). In making her mental RFC finding, the ALJ considered that Ms. West successfully completed Job Corps training, and that during this training, Ms. West lived cooperatively in a dormitory with three other individuals and studied academic subjects. (R. 24). The ALJ also noted that Ms. West "engaged in substantial gainful activity for [eleven] months" for her grandmother, was consistently assigned a GAF score of 60, was repeatedly

described as "stable" by Ms. Todd, reported to Ms. Todd that she felt "good," and that Dr. Jerrold found that Ms. West's mental impairment was not severe. (R. 23, 24). Further, the ALJ considered that Ms. West testified that she got along with friends, but did not like crowds, and also reasoned that "[t]here [was] no indication in [Ms. Todd's] treatment notes of concentration, persistence, or pace problems," and that "[t]here [was] no evidence of decompensation." (R. 24). The ALJ concluded that Ms. West had "mild limitations in activities of daily living," "moderate limitations in social functioning," and "mild limitations in concentration, persistence, and pace." (R. 24).

In addition, the ALJ further considered Ms. West's mental impairments when analyzing whether Ms. West's impairments met one of those listed in the Commissioner's regulations. (*See* R. 26). The ALJ noted Ms. Todd's assessment that Ms. West had "marked limitations in maintaining social functioning and frequent deficiencies of concentration, persistence, or pace," but determined these conclusions to be inconsistent with the GAF score of 60 assigned by Ms. Todd, and Ms. Todd's "own evaluations of [Ms. West's] mental abilities and aptitude to do unskilled work." (R. 26). The ALJ noted— despite Ms. Todd's assessment that Ms. West had marked difficulties in maintaining social functioning— that Ms. Todd determined that Ms. West had a "good" ability to get along with co-workers or peers without unduly distracting them. (R. 26). In addition, although Ms. Todd opined that Ms. West had frequent deficiencies of concentration, persistence, or pace, the ALJ noted that Ms. Todd assessed that Ms. West had a "good" ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two hour segments, and make simple work-related decisions. (R. 26). The ALJ also noted that Ms. Todd assessed that Ms. West had a "fair" ability to understand and remember detailed instructions, set

realistic goals or make plans independently of others, and deal with stress of semiskilled and skilled work. (R. 26). Further, as noted above, although Ms. Todd assessed that Ms. West had repeated episodes of deterioration or decompensation in work or work-like settings, the ALJ found no evidence of decompensation in Ms. Todd's treatment notes. (R. 24). Although the ALJ did not discuss these factors in the section devoted to her RFC assessment, given the "commonsensical" reading due the ALJ's overall decision, *Shramek*, 226 F.3d at 811 (quoting *Johnson*, 189 F.3d at 564), the ALJ's decision sufficiently enables the court to "trace the path" of the ALJ's reasoning. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (internal quotation marks and citations omitted) (noting that an ALJ need only enable the reviewing court to "trace the path" of her reasoning).

Ms. West argues that the ALJ impermissibly "played doctor" and failed to support her mental RFC finding with medical evidence from the record. (Mem. Supp. Pl.'s Mot. Reverse 6). Indeed, an ALJ may not arbitrarily substitute her own opinion for a physician's but can rely on other, arbitrary medical evidence in the record. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). However, the ALJ can weigh the evidence in the record and resolve conflicts, if necessary. *See Diaz*, 55 F.3d at 306 n.2.

In this case, the ALJ appropriately considered the relevant medical and nonmedical evidence in making her mental RFC determination. She considered Dr. Jerrold's conclusion that Ms. West's mental impairment was not severe, Ms. Todd's evaluations of Ms. West's mental abilities, Ms. West's own testimony, and the fact that Ms. West completed Job Corps training and worked at the substantial gainful activity level for her grandmother. (R. 25, 26). Ms West argues that the ALJ rejected the opinions of both Ms. Todd and Dr. Jerrold, and therefore—given

that these were the only medical opinions regarding Ms. West's mental RFC—lacked a medical basis for her mental RFC finding. (Mem. Supp. Pl.'s Mot. Reverse 6).

However, there is no indication that the ALJ rejected Dr. Jerrold's opinion for purposes of the mental RFC assessment. The ALJ gave Ms. West "every benefit of the doubt" in determining that her mental impairment was severe, despite Dr. Jerrold's opinion that it was not severe. (R. 24). But the ALJ was still entitled to evaluate Dr. Jerrold's opinion when determining Ms. West's mental RFC. In fact, given the ALJ's conclusion that Ms. West's mental impairments result in "mild limitations" on her life, it is clear that the ALJ relied on Dr. Jerrold's opinion in formulating her mental RFC assessment. (*See* R. 24). The ALJ adequately considered both medical and non-medical evidence from the record in determining Ms. West's mental RFC, and therefore sufficiently constructed a "logical bridge." *See Diaz*, 55 F.3d at 306–07 (upholding the ALJ's determination that the claimant could perform sedentary work when the ALJ adequately considered both medical and non-medical evidence).

Ms. West next contends that the ALJ did not properly evaluate the opinion of Ms. Todd concerning Ms. West's mental RFC before rejecting it. (Mem. Supp. Pl.'s Mot. Reverse 6). According to Ms. West, the ALJ improperly rejected Ms. Todd's opinion solely based on two inconsistencies: Ms. Todd's own evaluations of Ms. West's mental abilities and the fact that Ms. Todd assigned Ms. West a GAF score of 60. (*Id.* at 7). These contentions are also unpersuasive.

In general, a "treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)

(citing 20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).[7]

However, the treating physician's opinion is "not the final word on a claimant's disability." *Reynolds v. Bowen*, 844 F.2d 451, 455 (7th Cir. 1988). In fact, "the opinion of a treating physician is entitled controlling weight only if supported by the objective medical evidence." *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). Therefore, the ALJ may disregard the treating physician's opinion if it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates [her] reasons for crediting or rejecting reasons of disability." *Skarbek*, 390 F.3d at 503 (internal quotation marks and citations omitted).[8]

In this case, the ALJ concluded that Ms. Todd's assessments were internally inconsistent with her assignment of a GAF score of 60 to Ms. West (which indicates only moderate symptoms), and Ms. Todd's own evaluations of Ms. West's mental abilities. (R. 26). As to Ms. Todd's evaluations, the ALJ noted that Ms. Todd gave Ms. West "good" and "fair" ratings in several areas in the mental impairment questionnaire completed in August, 2006. (R. 26). Contrary to Ms. West's argument, the ALJ also considered other factors in discounting Ms. Todd's opinion.

The ALJ noted that Ms. West "successfully completed Job Corp[s] training," "engaged in substantial gainful activity for [eleven] months," testified that she got along with friends, and that Dr. Jerrold found that Ms. West's mental impairment was not severe. (R. 24). The ALJ also assessed that Ms. Todd's treatment notes did not indicate problems with concentration,

---

[7] Ms. Todd is not an M.D. and therefore is not a "physician." (R. 51). However, she is Ms. West's treating social worker. (R. 51–52).

[8] This minimal articulation requirement is consistent with that in the "logical bridge" cases. *Mueller v. Astrue*, 860 F.Supp.2d 615 (N.D.Ill. 2012).

persistence, or pace, and that there was no evidence of decompensation. (R. 24). Therefore, the ALJ gave valid reasons for discounting Ms. Todd's opinion. *See Henke v. Astrue*, No. 498 Fed.Appx. 636 (7th Cir. 2012)(upholding the ALJ's rejection of the treating physician's opinion when the opinion was unsupported by the physician's treatment notes, internally inconsistent, and contradicted by other evidence in the record); *Schmidt*, 496 F.3d at 842; *Skarbek*, 390 F.3d at 503–04.

Although the ALJ did not discuss these factors in the section of the decision about Ms. West's RFC assessment, it was discussed elsewhere, and to reject the ALJ's analysis specifically devoted to Ms. West's mental RFC because of its placement in the decision would be pointless and would constitute "nitpicking" at its worst. Social Security cases are not an exception to the basic principle that law addresses itself to actualities, to substance over form. *Cf., American Bank v. City of Menasha,* 627 F.3d 261, 267 (7th Cir. 2010); *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co* ., 671 F.3d 635 (7th Cir.2011).

Further, the ALJ did not "cherry-pick" Ms. Todd's treatment notes—ignoring information favorable to finding Ms. West disabled—to undermine her assessment. The ALJ recognized that Ms. Todd assessed that Ms. West had "marked limitations in maintaining social functioning and frequent deficiencies of concentration, persistence, or pace," but discounted these assessments because they were internally inconsistent and inconsistent with other evidence in the record. (R. 24, 26). It is true that the ALJ did not mention the GAF score of 50 (which indicates serious symptoms) assigned by Dr. Tate. (*See* R. 558). Indeed, "'[a]n ALJ may not select and discuss only that evidence that favors [her] ultimate conclusion, but must articulate, at some minimum level, [her] analysis of the evidence to allow the . . . court to trace the path of [her] reasoning.'" *Diaz*, 55 F.3d at 307. However, the ALJ "need not provide a written

evaluation of every piece of testimony and evidence." *Id.* (citing *Carlson*, 999 F.2d at 181).  In this case, the ALJ's implicit rejection of the GAF score of 50 is consistent with the ALJ's specific rejection of Ms. Todd's opinion, and is supported by the ALJ's consideration of the fact that Ms. West was consistently assigned a GAF score of 60, and that Ms. Todd repeatedly described Ms. West as "stable."  (R. 23–24).  Therefore, the ALJ's implicit rejection of this evidence is sufficient.  *See Diaz*, 55 F.3d at 307 (holding that the ALJ's implicit rejection of medical evidence was consistent with the ALJ's specific findings and was therefore sufficient).

In addition, the ALJ did not ignore the "nature of mental illness" in making her assessment.  Ms. West asserts that the ALJ's rejection of Ms. Todd's opinion is similar to *Punzio v. Astrue*, 630 F.3d 704 (7th Cir. 2011), where the ALJ failed to consider whether the treating physician's mental RFC questionnaire was consistent with the physician's treatment notes as a whole.  (Mem. Supp. Pl.'s Mot. Reverse 7–8).  Individuals suffering from mental illness undoubtedly have "better days and worse days," making a "snapshot" such as a GAF score or treatment notes from a particular day inadequate to undermine a treating physician's opinion.  *See Punzio*, 630 F.3d at 710 (a "snapshot . . . says little" about a mentally ill individual's overall condition).  However, as noted above, in this case, the ALJ based her rejection of Ms. Todd's assessment on more than Ms. West's GAF score, and in rejecting Ms. Todd's opinion, the ALJ considered Ms. Todd's treatment notes as a whole (specifically, the absence in the treatment notes of any indication of concentration, persistence, or pace problems), as well as additional evidence from the record.  (*See* R. 24, 26).  The ALJ noted that Ms. West was consistently assigned a GAF score of 60, that Ms. Todd repeatedly described Ms. West as "stable," and that Ms. West reported that she "felt good," was "relaxed and proud," and "had plans for job interviews."  (R. 23–24).

Ms. West then argues that the ALJ erred by not re-contacting Ms. Todd to determine the basis for her opinions before rendering a decision. (Mem. Supp. Pl.'s Mot. Reverse 9). An ALJ does have "a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(3)). An ALJ need only do so when the information in the record is "inadequate." *See Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir, 2007) (stating that an ALJ "may contact treating physicians when the information already in the record is inadequate"). In this case, the record was not inadequate. Rather, the ALJ found that Ms. Todd's opinion was internally inconsistent and inconsistent with other evidence in the record. (*See* R. 24, 26).

Finally, Ms. Todd argues that the ALJ's characterization of Ms. Todd's assessment as "a dead man mental residual functional capacity assessment" suggests that the ALJ did not fairly evaluate Ms. West's claim. (Mem. Supp. Pl.'s Mot. Reverse 10). Based on the ALJ's Decision, it seems clear that the use of the term "dead man" is merely a convenient shorthand to suggest that a treating physician is "bend[ing] over backwards" to assist a patient in obtaining benefits. That is not an uncommon situation. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (stressing that treating physicians are often more familiar with the alleged impairments of social security claimants, they also may attempt to "bend over backwards" to assist patients in obtaining benefits).

Courts begin with the presumption that the hearing officer is not biased. *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007) (citations omitted). "It is only after a petitioner has demonstrated that the decisionmaker 'displayed deep-seated and unequivocal antagonism that would render fair judgment impossible' that the presumption is rebutted, the findings set aside, and the matter remanded for a new hearing." *Id. See also Liteky v. United States*, 510 U.S. 540,

556 (1994). The ALJ's use of the term "dead man" in this case falls short of that requisite conduct. In *Terry v. Astrue*, the ALJ used the term "dead claimant RFCs" during the hearing, and asked the claimant's counsel, "[h]ey what's my job here, you know, write checks?" *Terry*, 580 F.3d at 475. Even in that case, the ALJ's use of the term was only one reason among several for remand. *See id.* at 475–78. Absent other displays of bias, the ALJ's use of the term "dead man" does not warrant reversal.

## 2.
### The ALJ's Adverse Credibility Determination

Ms. West argues that the ALJ's adverse credibility determination regarding her pain was conclusory, and that therefore the ALJ "did not properly analyze the extent and limiting effects of [Ms. West's] pain" on her RFC. (Mem. Supp. Pl.'s Mot. Reverse 11). This argument is unpersuasive.

"Because the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record." *Dixon*, 270 F.3d at 1178–79. Accordingly, the court "will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken." *Simila*, 573 F.3d at 517 (citing 20 C.F.R. § 404.1529(c)(2)–(4); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)). "In the end, 'an ALJ may disregard a claimant's assertions of pain if [s]he validly finds her incredible.'" *Id.* (quoting *Prochaska*, 454 F.3d at 738).

In this case, the ALJ concluded that Ms. West's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 27). Ms. West quite correctly criticizes the ALJ's use of this boilerplate language. (Mem. Supp. Pl.'s Mot. Reverse 15). Indeed, although the Seventh Circuit has repeatedly criticized ALJs' use of this formula, *see, e.g.*, *Shauger v. Astrue*, 675 F.3d 690, 696–97 (7th Cir. 2012) (describing it as "unhelpful"); *Parker v. Astrue*, 597 F.3d 920, 921–22 (7th Cir. 2010)(describing it as "meaningless"), ALJs in this district persist almost perversely in using it.

However, the use of the phrase, by itself, does not make the credibility determination invalid, *Pierce v. Astrue*, 2013 WL 147414, 10-11 (N.D.Ill. 2013)(collecting cases), and the primary inquiry is whether the credibility determination is supported by evidence in the record. *See Punzio*, 630 F.3d at 709 (holding that the ALJ's credibility determination was invalid when the ALJ used the boilerplate language, and provided no other justification for the determination from evidence in the record); *Pierce, supra*.

In this case, the ALJ supported this conclusion with evidence from the record. The ALJ noted Ms. West's testimony that her upper back pain was a "five" and that her low back pain was a "ten," but also considered that Ms. West did not use prescription pain medications, and instead used only over-the-counter medications and a heating pad. (R. 27). The ALJ determined that it was "simply not credible that [Ms. West's] pain [was] so intractable that she [could not] work." (R. 27). The ALJ also considered Dr. Zimmerman's May 2006 examination, and determined that although Dr. Zimmerman had opined that Ms. West could have performed light work during the period from August 2005 to August 2006, Ms. West could only have performed

sedentary work during that period. (R. 27). The ALJ agreed with the ME that "there was never a period of [twelve] months or more that claimant could not have performed sedentary work." (R. 27).

As with the ALJ's discussion of Ms. West's mental impairments, the ALJ did not limit her discussion of Ms. West's pain to the section of the decision devoted to the RFC assessment; she also discussed the credibility of Ms. West's pain when considering whether her impairments met one of those listed in the Commissioner's regulations. (*See* R. 25). The ALJ noted that Ms. West only used over-the-counter medication and a heating pad to alleviate her pain, and concluded that Ms. West's pain was not "as intractable as she describe[d]," particularly considering the aggressive nature with which she treated her pain in 2006. (R. 25). The ALJ asserted that "one would expect [Ms. West] to seek treatment and pain management," and stated that she believed Ms. West had "magnified her symptoms." (R. 25).

The ALJ also considered Dr. Rana's examination of Ms. West in her credibility assessment, particularly Dr. Rana's findings that the "examination of [Ms. West's] musculoskeletal system revealed no swelling, redness, or tenderness of any joint," that Ms. West "used no assistive device for ambulation," and that her gait was normal. (R. 25). The ALJ noted that Ms. West had successful surgery and that Dr. Schiable had opined, following the surgery, that Ms. West was "coming along." (R. 25). Therefore, the ALJ's credibility determination was not conclusory as Ms. West alleges, and consequently, the ALJ's implicit assessment that Ms. Todd's pain would not inhibit her ability to work is supported by substantial evidence. *See Rice v. Barnhart*, 384 F.3d 363, 370–71 (7th Cir. 2004) (upholding the ALJ's adverse credibility determination, and consequently the ALJ's conclusion that the claimant was not disabled).

Further, the ALJ did not fail to address medical testimony favorable to Ms. West's claim. The ALJ noted that Ms. West was treated at Christ Hospital and Medical Center, was diagnosed with a herniated L5-S1 disc, received numerous lumbar epidural steroid injections, and had surgery on her back. (R. 25). Ms. West also argues that the ALJ did not consider the testimony of the ME acknowledging that pain varies from individual to individual. (Mem. Supp. Pl.'s Mot. Reverse 12). However, the ALJ explicitly agreed with the ME that there was not a twelve-month period during which Ms. West could not have performed sedentary work. (R. 27). The ME came to this conclusion in spite of his acknowledgment concerning the nature of pain. (R. 87). Therefore, the ALJ did not fail to address the ME's testimony.

Finally, Ms. West argues that the ALJ failed to discuss Ms. West's obesity in making her credibility and RFC assessments. (Mem. Supp. Pl.'s Mot. Reverse 14). "According to SSR 02-1p, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment." *Prochaska*, 454 F.3d at 736 (citing *Clifford*, 227 F.3d at 873). However, failure to address the effects of obesity may be harmless error. *Id.* In fact, the Seventh Circuit has recognized that when a claimant fails to specify how her obesity further impairs her ability to work and the ALJ indirectly factors in the claimant's obesity, the ALJ's failure to explicitly address the effects of obesity is harmless error. *See, e.g.*, *Id.* at 737; *Skarbek*, 390 F.3d at 504.

In this case, in her RFC assessment, the ALJ agreed with the ME's opinion that "there was never a period of [twelve] months or more that claimant could not have performed sedentary work." (R. 27). The ME explicitly considered Ms. West's obesity in making his RFC determination. (R. 87). In addition, Ms. West merely speculates that her obesity may make it more difficult for her to sit or stand for long periods of time, but does not specify how her

obesity further limited her ability to work. (Mem. Supp. Pl.'s Mot. Reverse 14–15); *see also Prochaska*, 454 F.3d at 504 (holding that the claimant failed to show how his disability further impaired his ability to stand and walk when he merely speculated that those activities were more difficult because of his obesity). It must be remembered that obesity is not synonymous with disability.

In short, the ALJ effectively considered Ms. West's obesity, and considering that Ms. West failed to specify how her obesity further impaired her ability to work, the ALJ's failure to explicitly consider Ms. West's obesity in her RFC assessment is harmless error. *See Prochaska*, 454 F.3d at 736; *Skarbek*, 390 F.3d at 504..

## Conclusion

The Commissioner's motion to affirm the ALJ's decision is granted, and the Plaintiff's motion is denied.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 7/16/13